UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                Plaintiff,

        v.

DARYL SESSION,

                Defendant.

_____

<u>REPORT & RECOMMENDATION</u>

06-CR-6091L

By Order of Hon. David G. Larimer, United States District Judge, dated May 31, 2006, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 91).

Defendant Daryl Session (hereinafter "Session") is charged in a three-count indictment.  The first count charges that between January 2000 and April 2005, Session conspired with others to possess with intent to distribute, and to distribute, five kilograms or more of cocaine and fifty grams or more of cocaine base, in violation of 21 U.S.C. § 846.  The second count charges that on April 9, 2005, Session possessed with intent to distribute 500 grams or more of cocaine and fifty grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) and 18 U.S.C. § 2.  The final count charges that in April 2005, Session possessed a firearm in furtherance of the drug trafficking crimes alleged in the previous counts, in violation of 18 U.S.C. § 924(c)(1)(A)(i).  (Docket # 90).

Currently pending before this Court are Session's motions to suppress statements and tangible evidence, to dismiss Count Three of the Indictment and to compel specific performance of a cooperation agreement he contends he entered into with the government.[1] (Docket # 109).  The following constitutes this Court's Report and Recommendation concerning each of the motions.

## FACTUAL BACKGROUND

The Court's understanding of the factual background in this case is derived from three different sources.  The first is an eavesdropping warrant that was issued by Monroe County Court Judge Richard A. Keenan authorizing the interception of communications over cellular telephone number (585) 802-8833.  The second source is a search warrant, also issued by Judge Keenan, for Session's residence at 67 Quentin Road in the City of Rochester, New York.  The third is evidence adduced during a suppression hearing conducted before this Court on December 1, 2006.

**Wiretap Warrant**:  This Court has reviewed the wiretap warrant issued for cellular telephone number (585) 802-8833 (hereinafter the "target cellular telephone"), as well as the supporting affidavit of Rochester Police Officer Timothy Pearce. In his wiretap application, Officer Pearce affirmed that since October 2003, he had been conducting an investigation into

---

[1]  Session's omnibus motion relating to the indictment also sought, *inter alia*, an audibility hearing, a bill of particulars, discovery and inspection, *Brady* material, *Jencks* material, rulings on evidentiary matters under Rules 404, 608 and 609 of the Federal Rules of Evidence, identification of confidential informants, the preservation of rough notes, suppression of statements by co-conspirators, disclosure of the transcript of Session's testimony before the grand jury and voir dire of expert witnesses outside the presence of the jury.  (Docket # 109).  Each of these requests was either resolved by the parties or decided in open court by the undersigned on November 7, 2006. (Docket ## 112, 113).

illegal narcotics and weapons activities of Session, Deshaun Brown and other unknown conspirators.  (Docket # 111-2 ("Pearce Aff.") at ¶ 5).  Pearce had identified Session and Brown as cocaine dealers and affirmed that probable cause existed to believe they had committed or had conspired to commit narcotics trafficking and weapons offenses and that they were utilizing the target cellular telephone to further their narcotics activities.  (*Id.*).  The affidavit stated that the target telephone was subscribed to Brown and was used by Brown and Session "to further their narcotics distribution network."  (*Id.*).

Pearce's affidavit explained that his assertions were based upon, among other things, information provided by various confidential informants.  The first, who was identified as "CS-1," had previously provided reliable information and was personally known by Pearce.[2]  In October 2003, CS-1 advised Pearce that a black male named "Daryl Sessions,"[3] who was also known as "D" or "Dazzy," was selling large quantities of cocaine in the Rochester area and that CS-1 had been buying cocaine from him for approximately seven years.  (*Id.* at ¶ 11).  According to CS-1, one of Session's previous narcotics partners, another black male named Sean or "Big S," was currently incarcerated.  Pearce later identified this individual as Shonn Jackson and confirmed that he was imprisoned at Ulster Correctional Facility following his conviction on narcotics offenses.  (*Id.*).

CS-1 also reported to Pearce that when Jackson went to prison, he provided Session with his cocaine "connection," a Dominican male named "Vick" who lived in New York

---

[2]  Pearce's affidavit does not disclose the gender of any of the confidential informants referenced therein. For ease of reading, this Court shall use the male pronoun in referring to each.

[3]  Pearce's affidavit occasionally refers to Session as "Sessions."

3

City.  CS-1 further reported that Session received between four and fifteen kilograms of cocaine several times each month.  The cocaine was allegedly transported by bus from New York City to Rochester by a courier known as "Ray," whom CS-1 described as Dominican, heavy-set and approximately thirty-five years old.  According to CS-1, when Ray arrived in Rochester, he would take a taxi to the Days Inn located on East Avenue and Alexander Street.  Ray would then meet Session at 16 Rundell Park, where he would provide Session with the cocaine.  Following the transaction, Ray would return by bus to New York City with the proceeds of the sale.  (*Id.*).

CS-1 advised Pearce that Session had recently moved to 67 Quentin Road and that he drove a black Mercedes 500 that was registered to him.  Session also drove a pearl-colored Cadillac Escalade, a turquoise Grand Am and a Chrysler, all of which were registered to his mother, Shirley Session, who resided at 393 Flint Street.  According to CS-1, Session had been selling cocaine for a long time and had amassed a substantial amount of currency, which he stored in a safe at 67 Quentin Road or at his mother's house at 393 Flint Street.  Finally, CS-1 identified particular cellular telephone lines that Session used to conduct his cocaine trafficking business.  (*Id.*).

According to CS-1, Session had two half-brothers, Avery Brown and Deshaun Brown (also known as "DB"), who were involved in his narcotics activities.  CS-1 further represented that "all the handguns that Session gets are supplied by . . . Brown, who also sells cocaine."  (*Id.* at ¶ 24).

Pearce's further described in his affidavit information he learned about Session in April 2004 from a second confidential informant ("CS-2") following that informant's arrest. CS-2 stated that he had known Session for approximately two or three years and knew him to use

the street name "Dazzy." During that period of time, CS-2 made "numerous" half-kilogram or more purchases of cocaine from Session, which he arranged during cellular telephone calls with Session. (*Id.* at ¶ 25).

Pearce's affidavit also described his interactions with a third confidential informant ("CS-3"), whom he met on July 19, 2004, and who was also cooperating with law enforcement following his arrest. During Pearce's initial meeting with CS-3, CS-3 reported that he purchased large quantities of cocaine from Deshaun Brown, who had been selling cocaine for many years. CS-3 also stated that Brown used the target cellular telephone. (*Id.* at ¶ 26).

CS-3 made three controlled purchases of cocaine from Deshaun Brown during the investigation, the first of which occurred on August 2, 2004. On that day, in Pearce's presence, CS-3 called the target cellular telephone, spoke with Brown and arranged a subsequent meeting with him. Brown drove to the designated location in a black Chevy Tahoe that was registered to him. During the meeting, CS-3 purchased a "31" (approximately thirty-one grams) of cocaine from Brown for $950. Following the purchase, officers followed Brown to 67 Quentin Road and observed him enter Session's residence. (*Id.* at ¶ 27).

CS-3 attempted a second controlled purchase on October 15, 2004. CS-3 again contacted Brown over the target cellular telephone, and Brown directed him to a particular location where they would meet. Before the meeting, Brown called CS-3 and instructed him to meet at a different location. During that meeting, CS-3 and Brown made arrangements for the purchase, and Brown instructed CS-3 to meet him at yet another location. Officers' attempts to surreptitiously follow Brown were unsuccessful, and the transaction was postponed. (*Id.* at ¶ 28).

In January and February 2005, CS-3 again made controlled purchases of cocaine from Brown.  On both January 25 and February 15, CS-3 made arrangements to purchase cocaine by speaking with Brown over the target cellular phone.  On both occasions, Brown arrived at the meeting location in a green Chevy Tahoe and sold a "31" of cocaine to CS-3 for $950.  (*Id.* at ¶¶ 31, 32).

On December 28, 2004, Pearce and Officer David Simpson met with a fourth confidential informant ("CS-4"), whom Pearce knew and who previously had provided reliable information.  CS-4 told the officers that he had purchased cocaine from Deshaun Brown on numerous occasions and had made arrangements for those purchases by telephoning Brown over the target cellular telephone.  (*Id.* at ¶ 29).

The following day, Pearce and Simpson met with CS-4 to arrange a controlled purchase of cocaine from Deshaun Brown.  A call was placed by the officers to the target cellular telephone.  After several attempts, Brown returned the call to CS-4's telephone, and they arranged to meet for the transaction.  Brown thereafter arrived at the agreed-upon location driving a green Chevy Tahoe.  During the meeting, CS-4 purchased an "eight-ball" (approximately three and one-half grams) of cocaine from Brown.  (*Id.* at ¶ 30).

**Search Warrant:**  On April 7, 2005, Judge Keenan issued a search warrant for Session's residence at 67 Quentin Road based upon a supporting affidavit of Officer Pearce that incorporated by reference prior wiretap applications, including the one described in the previous section.  (Docket # 124-2 ("Pearce Aff. 2")).  With respect to narcotics activity at Session's residence, Pearce affirmed that on March 2, 2005, Investigator Janus of the Rochester Police

Department received information from a reliable confidential informant that a burglary had

occurred at 67 Quentin Road and that two to four kilograms of cocaine, $50,000 cash and two

safes were taken from the location.  (Pearce Aff. 2 at ¶ 22).  The burglary was corroborated by an

intercepted telephone conversation that occurred one week later between Session and Deshaun

Brown.  During that conversation, Session expressed his anger over the burglary and discussed

possible retaliation against those he believed were responsible.  (*Id.* at ¶ 23).  Pearce's affidavit

also reported that when he discussed the burglary, Session expressed relief that the police had not

responded to his burglar alarm because the burglars had overlooked an item that could have

caused Session to be arrested under the "Project Exile" program.  (*Id.* at ¶ 47).  Pearce opined

that the item must have been a firearm.  (*Id.*).

Pearce's affidavit further described his belief that a shipment of narcotics had

been delivered to Session at 67 Quentin Road on March 19, 2005.  Specifically, on that day, at

approximately 3:47 p.m., a telephone call was intercepted between Session and Kennetta Powell.

During the call, Powell agreed to return to Rochester from Greece, New York, in order to do a

"favor" for Session.  At 4:08 p.m., Powell called Session to tell him that she was on the way.

Approximately one minute later, law enforcement officers observed a taxi arrive at 67 Quentin

Road.  A light-skinned black or Hispanic male, dressed in a blue jacket and blue jeans, emerged

from the residence carrying a large, blue duffel bag and entered the taxi.  Investigator Janus

followed the taxi from Session's residence to the Days Inn at the intersection of East Avenue and

Alexander Street, where the passenger exited.  (*Id.* at ¶ 33).

Meanwhile, officers observed a red Lebaron arrive at 67 Quentin Road at

approximately 4:12 p.m.  A black female exited the car and entered the residence.  Two minutes

later the woman exited, carrying a large garbage bag, which she placed in the rear seat of the vehicle; she then drove away.  The Lebaron drove to 1305 Culver Road, where the woman parked in a driveway behind an apartment building.  She looked around several times as she left the car, retrieved the garbage bag and entered the rear door of the apartment building.  At approximately 4:24 p.m., she returned to the Lebaron and drove to 1575 Norton Street.  Pearce opined, based upon his training and experience, that the light-skinned male had arrived from New York City to deliver cocaine to Session, which Powell then retrieved from Session's residence and transported to 1305 Culver Road.  (*Id.*).

That same day, at approximately 8:50 p.m., Pearce confirmed with a Days Inn employee that the individual who had been seen leaving Session's residence in the taxi and arriving at the Days Inn had checked out of his room and had departed the hotel in a taxi.  The individual was identified as Reinaldo Navarro.  (CS-1 had identified Session's New York City courier as "Ray."  (*Id.* at ¶ 35)).  Pearce reviewed a bus schedule and determined that a bus was scheduled to depart for New York City at 9:10 p.m.  He and other officers then drove to the bus station, where they observed a Hispanic male with slight facial hair, who was wearing a black coat and black jeans and carrying a large duffel bag, board a bus bound for New York City.  (*Id.* at ¶ 34).  Pearce later determined that Navarro had checked into the Days Inn on the morning of the same day that he departed.  (*Id.* at ¶ 35).

Several days later, on March 26, 2005, at approximately 4:32 p.m., another call between Session and Powell was intercepted.  In the call, Session asked Powell to "bring that to me and bring that, bring that scazale too alright."  (*Id.* at ¶ 39).  Powell was observed leaving 1305 Culver Road about six minutes later, carrying a baby and a small bag.  Powell placed the

baby and bag into her Lebaron, which she drove to 67 Quentin Road.  When she arrived, she parked her car in the driveway behind Deshaun Brown's car and entered the residence with both the baby and the bag.  She exited approximately four minutes later, carrying only the baby, and departed.  (*Id.* at ¶ 40).

A few minutes later, a grey Dodge Durango arrived at 67 Quentin Road.  A black male exited the vehicle, entered the residence, returned to the vehicle twenty minutes later and drove away.  After a records check revealed that the vehicle's registration had expired, Rochester Police Officer Wilcox conducted a traffic stop of the car, and the driver was identified as Tony Anthony Jones.  During the stop, Officer Wilcox detected a strong chemical odor and observed a sandwich bag containing a white substance protruding from the front pocket of Jones's pants, which was later determined to contain over 180 grams of cocaine.  A subsequent inventory search of the vehicle revealed another half kilogram of cocaine hidden under the front passenger seat.  In addition, more than twenty grams of crack cocaine was discovered in Jones's sneaker. (*Id.* at ¶¶ 41-42).

The next day a call was intercepted between Session and Jones's wife in which they discussed Jones's arrest.  Session commented during the call, "I can't believe that shit, it's more money going down the drain."  (*Id.* at ¶ 43).

On April 6, 2005, at approximately 12:18 p.m., a telephone call was intercepted between an unknown female caller and Session.  During the call, the female indicated that she wanted to see Session, and Session replied, "alright come on, hurry up."  Within an hour, a surveillance video camera revealed a black female arrive at 67 Quentin Road and enter the front door of the residence.  Approximately four minutes later, the same woman exited 67 Quentin

Road, carrying herself as if she were concealing something under her jacket.  The female entered

the front driver's side of a gray Chrysler minivan registered to Tony Jones.  Once she was in the

vehicle, she reached under her jacket and handed an unidentified item to a female passenger.  She

then returned to 558 Driving Park Avenue, the address listed on Jones's vehicle registration.  (*Id.*

at ¶ 46).


**Suppression Hearing**:  At the December 1, 2006 suppression hearing,

Investigator Thomas Janus of the Rochester Police Department testified on behalf of the

government.  Daryl Session was called by the defense.

**Testimony by Investigator Janus:**  Investigator Janus testified that on

April 9, 2005, he conducted a post-arrest interview of Session in the Monroe County Public

Safety Building.  (Tr. 26).[4]  At approximately 12:00 p.m., Janus and Special Agent John Hayes of

the Bureau of Alcohol, Tobacco, Firearms and Explosives entered the interview room and

introduced themselves to Session.[5]  (Tr. 27-29).  Janus told Session that he had been arrested on

narcotics charges and indicated that the officers were interested in speaking with him about the

investigation.  Janus ascertained that Session could read, write and understand English, had

completed the eleventh grade and had received his general equivalency diploma.  (Tr. 30-31).

Janus then advised Session of his *Miranda* rights by reading the rights from a Rochester Police

---

[4]  The transcript of the suppression hearing conducted before this Court on December 1, 2006, shall
hereinafter be referenced as "Tr. __."  (Docket # 118).

[5]  At some point, Pearce entered the room and joined the interview.  (Tr. 28).

Department *Miranda* notification and waiver card.  (Tr. 30-31; Government's Exhibit ("G.Ex.")

1).  Specifically, Janus advised:

> You have the right to remain silent.  You do not have to say
> anything, if you don't want to.  Anything you do say can be used
> against you in a court of law.  You have the right to talk to a lawyer
> before answering any questions and have him here with you.  If
> you can't pay for a lawyer, one will be given to you before any
> questioning, if you wish.  And if you do wish to talk with me, you
> can stop me at any time.

(Tr. 32).  After reading the *Miranda* warnings, Janus asked Session whether he understood his

rights and whether he agreed to waive his rights and speak with him.  Session responded

affirmatively to both questions, and Janus recorded those responses on the waiver card.  (Tr. 32).

Janus testified that Session was polite and appeared lucid, sober and coherent throughout this

process.  (Tr. 33).

During the subsequent interview, Janus questioned Session about narcotics

trafficking activities.  According to Janus, Session never indicated that he did not want to speak,

nor requested to speak with an attorney.  (Tr. 36-37).  The interview lasted approximately one

hour.  (Tr. 34).  In the course of the interview, Session inquired about the possibility of

cooperating with the prosecution.  Janus indicated that cooperation was a possibility, but that he

was not authorized to make any promises or agreements.  (Tr. 34, 63-64).  At the conclusion of

the interview, Session declined to provide a written statement.  Several hours later, Janus

prepared a written report of the interview.  (Tr. 35, 64; G.Ex. 2).

**Testimony by Session:**  Daryl Session testified that on April 9, 2005 at

approximately 11:00 a.m., eight to twelve police officers arrived at his residence at 67 Quentin

Road.  The officers were dressed in black, wore black masks and carried shotguns and sidearms.

11

(Tr. 70-71).  The police entered his residence by knocking down the front door with a battering ram.  As they entered, they yelled, "Police, Police, nobody move, everyone get down."  (Tr. 71).  Session was handcuffed and placed face-down on the floor as the officers started to move throughout the house.  He remained on the floor for approximately forty-five minutes, when he asked one of the officers if he could sit.  An officer lifted him off the floor and placed him on a step.  (Tr. 72).  Approximately fifteen minutes later, Session asked to use the restroom, but was required to wait ten to fifteen minutes.  Twenty minutes later, Session was placed in a patrol car and driven downtown.  (Tr. 72-73).

Session was taken to be photographed, after which he was placed in a holding area and handcuffed to a table.  Although he had not yet been informed that he was under arrest, Session believed that he was under arrest.  (Tr. 75-76).  Approximately one-half hour later, two officers entered the room and escorted him to the fourth floor.  (Tr. 73-74).  Once the interview began, Investigator Janus stated, "You don't know me, but I know you.  I've been following your activities for several years.  I know you're not a bad person.  I know you're not a violent person.  You haven't been involved in violence.  I know you're very intelligent and I know you're very articulate."  (Tr. 77-78).  Janus further explained to Session that he had been caught with a substantial quantity of drugs, was in a lot of trouble and would help himself by cooperating.  (Tr. 77-78).  According to Session, Janus also indicated that Session had only one opportunity to cooperate and that he would not be able to do so in the future.  (Tr. 78).

Session testified that he began to cry and felt that he did not have any choice but to cooperate with the officers and tell them what they wanted to hear.  He told the officers that although he may have sold drugs, he was not a bad person and was willing to cooperate.  (Tr.

12

80).  According to Session, he was advised of his *Miranda* rights at this point, but never saw a

*Miranda* notification and waiver card.  (Tr. 79).  Session did not recall ever being given the

opportunity to make or review a written statement.  (Tr. 81).  Session admitted that he knew

during the interview that the investigators did not have authority to determine what, if any,

criminal charges would be brought against him or what sentence he might ultimately receive.

(Tr. 89).

## DISCUSSION

Session moves to suppress evidence obtained pursuant to the wiretap warrant for

the target cellular telephone and the search warrant for his residence at 67 Quentin Road.

Session also moves to suppress statements made by him during the interview at the Public Safety

Building.[6]  In addition to his motions to suppress, Session also moves for the dismissal of the

third count of the indictment.  (Docket # 109).  Finally, Session seeks specific performance of a

cooperation agreement he contends was entered into by the government.  (Docket # 109).

## I.  Motions to Suppress

### A.  Evidence Seized Pursuant to Eavesdropping Warrant:  Session moves to

suppress the government's use of statements made by him and intercepted pursuant the

eavesdropping warrant for the target cellular telephone.  Session argues that the initial wiretap

---

[6]  Session also moved to suppress evidence seized pursuant to a global positioning monitor that was installed on a vehicle operated by him.  (Docket # 109).  On December 1, 2006, the government represented that it did not intend to introduce any evidence relating to the global positioning monitor during its case-in-chief at trial. The government further advised that it did not oppose Session's suppression motion.  Accordingly, the Court granted Session's motion to suppress.  (Docket # 118 at 4).

warrant was unsupported by probable cause and that law enforcement failed to exhaust

traditional investigative techniques before resorting to the use of wiretaps.[7]  Finally, Session

argues that all evidence subsequently seized in this case should be suppressed as the fruit of the

unlawful wiretap.  (Docket # 9).

> **1.  <u>Probable Cause</u>:**  Session argues that the wiretap application lacked

probable cause because it falsely stated that the target cellular telephone was utilized by both

Session and Deshaun Brown, when in fact investigating agents knew that the telephone belonged

only to Brown.  (Docket # 109 at ¶ 96).  That false statement opened the door for the affiant to

impermissibly include allegations about Session and thereby bolster an otherwise inadequate

showing of probable cause to justify a wiretap of Brown's phone, Session further maintains.  (*Id.*

at ¶ 93).  ("The legal wrong is that the government sought an eavesdropping warrant upon a

demonstration of probable cause resting on the suspicious acts of two individuals, not one."  (*Id.*

at ¶ 92)).

> Pursuant to 18 U.S.C. § 2518(3), before issuing a wiretap order, a judge must

determine:

> > [1] that there is probable cause to believe that a crime has been, is
> > being, or is about to be committed; [2] probable cause to believe
> > that communications about the crime will be obtained through the
> > wiretap; [3] that alternative means have been tried and failed or
> > appear too dangerous or unlikely to succeed; and [4] probable
> > cause that the premises to be wiretapped are being used for
> > criminal purposes or are used or owned by the target of the wiretap.

*United States v. Wagner*, 989 F.2d 69, 71 (2d Cir. 1993).

---

[7]  The government concedes that conversations involving Session were intercepted pursuant to the wiretap
warrant and that Session has standing to challenge the warrant as an "aggrieved person."  *See* 18 U.S.C. § 2518(11);
*United States v. Fury*, 554 F.2d 522, 526 (2d Cir.), *cert. denied*, 433 U.S. 910 (1977).

The probable cause standard applicable to wiretaps is the same as that required for a traditional search warrant. *Id.* (citing *United States v. Rowell*, 903 F.2d 899, 901-902 (2d Cir. 1990); *United States v. Fury*, 554 F.2d at 530). In other words, probable cause must be determined by evaluating the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). As a reviewing court, this Court must accord "substantial deference" to the issuing court's finding of probable cause. *United States v. Wagner*, 989 F.2d at 72 (citations omitted).

Contrary to Session's argument, there is nothing impermissible about including in an application for a wiretap on one individual's phone factual allegations concerning another individual, especially where, as here, the crimes under investigation include conspiracy offenses between the two. The relevant inquiry is whether probable cause exists to believe that the target telephone is being used to communicate about criminal activity. Pearce's affidavit satisfies that inquiry.

A careful review of Pearce's affidavit shows that it adequately established probable cause to believe that Brown was using the target telephone to commit narcotics offenses. I also find that it sufficiently demonstrated probable cause to believe that Session was involved with his half-brother Brown in those narcotics activities. That finding is based upon the affidavit's description of information provided by CS-1, observations of Brown driving directly to Session's home following his sale of 31 grams of cocaine to CS-3, as well as records of hundreds of incoming and outgoing calls between the target telephone and phones commonly used by Session. (Pearce Aff. at ¶¶ 24, 27, 44). While this finding is not essential to justify the warrant, Pearce's inclusion of factual allegations relating to Session's purported narcotics activities was neither irrelevant, nor improper. Such evidence plainly related to the question

15

whether probable cause existed to believe that interception of communications over Brown's phone would yield evidence of narcotics offenses, including narcotics conspiracy offenses. (*See* Pearce Aff. at ¶ 5).

While Session maintains that Pearce's statement in his affidavit that Session used the target telephone was false, his memorandum is unclear whether he contends he is entitled to suppression on that basis alone. Even if his papers were read to include that argument, I would reject it. First, he has not made "a substantial preliminary showing that (1) the affidavit contained false statements made knowingly or intentionally, or with reckless disregard for the truth; and (2) the challenged statements . . . were necessary to the [issuing judge's] probable cause finding." *United States v. Levasseur*, 816 F.2d 37, 43 (2d Cir. 1987) (citing *Franks v. Delaware*, 438 U.S. 154, 171-72 (1978)), *cert. denied*, 507 U.S. 954 (1993). In the absence of such a showing, he is not entitled to a *Franks* hearing, let alone suppression.

Probable cause for the warrant existed irrespective of whether Session used the phone; it existed based upon the allegations of Brown's use of the phone. Indeed, the only communications occurring over the phone that were specifically identified by Pearce were those between Brown and two of the confidential informants relating to arrangements for narcotics transactions. Thus, I find that the challenged statement that Session used the target telephone – even if it had been made knowingly or recklessly[8] – was not necessary to the issuing judge's probable cause determination.

---

[8] I do not reach the question whether Session's assertions on this issue, which include his sworn statement that he never used Brown's telephone (Docket # 114-2 at ¶ 4), are sufficient to justify an evidentiary hearing.

2. **Failure to Utilize Traditional Investigative Techniques**:  Session also seeks suppression of the intercepted communications on the grounds that the supporting affidavit offered by Pearce failed to demonstrate that before resorting to the wiretap, traditional investigative procedures had been attempted and had proved unsuccessful.  Thus, according to Session, Pearce's affidavit failed to justify the need for wiretap interception.  (Docket # 109).

An application for wiretap authorization must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  A judge may approve a wiretap application only after determining that such a showing has been made.  18 U.S.C. § 2518(3)(c).  The intent of the requirement, however,

> is not to preclude resort to electronic surveillance until after all other possible means of investigation have been exhausted by investigative agents; rather, [it] only require[s] that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods.

*United States v. Torres*, 901 F.2d 205, 231 (2d Cir.), *cert. denied*, 498 U.S. 906 (1990).  *See also United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974) (18 U.S.C. § 2518 "is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime"); *United States v. Pacheco*, 489 F.2d 554, 565 (5th Cir. 1974), *cert. denied*, 421 U.S. 909 (1975) (intent of 18 U.S.C. § 2518(1)(c) is "not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques"); *United States v. Valdez*, 1991 WL 41590, *2 (S.D.N.Y.)

(the "other investigative procedures" requirement is not intended to turn electronic surveillance "into a tool of last resort"), *aff'd*, 952 F.2d 394 (2d Cir. 1991).

In narcotics conspiracy investigations, the requirement may be satisfied by "describing how traditional investigative techniques had failed to provide more than a 'limited picture' of . . . [the] narcotics organization." *United States v. Valdez*, 1991 WL 41590 at *2 (quoting *United States v. Torres*, 901 F.2d at 232). Moreover, wiretaps are particularly appropriate when "the telephone is routinely relied on to conduct the criminal enterprise under investigation." *United States v. Young*, 822 F.2d 1234, 1237 (2d Cir. 1987) (internal quotation omitted).

This Court's review of the issuing court's determination is not *de novo*; rather, it is the reviewing court's role "'to decide if the facts set forth in the application were minimally adequate to support the determination that was made.'" *Torres*, 901 F.2d at 231 (quoting *United States v. Scibelli*, 549 F.2d 222, 226 (1st Cir.) (collecting cases), *cert. denied*, 431 U.S. 960 (1977)); *see also United States v. Miranda*, 1993 WL 410507, *2 (S.D.N.Y. 1993) (issuing court's determination concerning sufficiency of normal investigative techniques is entitled to "substantial deference"). Applying this standard to the instant case, I find that Pearce's affidavit adequately identified the traditional investigative techniques that had been used and explained why the use of other traditional techniques reasonably appeared unlikely to succeed if used.

In his affidavit, Pearce identified that the goal of the investigation was to "stop, arrest and convict Daryl Session and Deshaun Brown and others yet unknown that [were] involved in [a] drug distribution network." (Pearce Aff. at ¶ 45(H)). Pearce further affirmed that despite his investigative efforts, he had been unable to determine the full scope of the

18

organization's activities, including the identities of individuals involved.  Specifically, Pearce described the traditional investigative techniques that either had been utilized and proved unsuccessful in furthering the goals of the investigation or had not be utilized because they were not likely to succeed.  (*Id.* at ¶¶ 48-55).

For example, Pearce's affidavit described the various reasons why investigating agents were reluctant to use any of the four informants to attempt to introduce an undercover officer to Session.  (*Id.* at ¶¶ 48, 52-55).  Pearce's affidavit also explained that because Brown frequently employed counter-surveillance measures, covert physical surveillance would likely have limited effectiveness in furthering the investigation.  (*Id.* at ¶¶ 56-58).  Pearce also described the likely ineffectiveness of pen registers, grand jury subpoenas, audio collection systems and search warrants in revealing the scope of the organization and fully identifying the other conspirators.  (*Id.* at ¶¶ 59, 61-63).

In sum, this Court finds that Pearce's affidavit sufficiently identified the traditional investigative techniques that had been utilized and adequately informed the issuing court why other techniques were unlikely to achieve the aims of the investigation.  I find that the factual recitations set forth in Pearce's affidavit adequately supported Judge Keenan's wiretap order.  *See Torres*, 901 F.2d at 231.  Session's motion to suppress the wiretap communications based upon the failure to demonstrate the futility of other investigative techniques should therefore be denied.

**3.  Fruit of the Poisonous Tree:**  In his final motion to suppress intercepted communications, Session argues that all communications should be suppressed as the fruit of the initial unlawful wiretap order.  Because I find that the wiretap order was sufficiently

19

supported by probable cause and that law enforcement properly demonstrated the unlikely

success of other investigative techniques, I recommend that Session's motion to suppress on this

basis be denied as well.


      **B.  Evidence Seized Pursuant to Search Warrant:**  Session also moves to

suppress evidence seized pursuant to the search warrant issued for his residence at 67 Quentin

Road.  (Docket # 109).  According to Session, the warrant violated the Fourth Amendment

because it did not state with particularity the items to be seized.[9]  (Docket # 109).

      The Fourth Amendment to the Constitution requires that a search warrant

"particularly describ[e] the place to be searched, and the person or things to be seized."  U.S.

Const. amend. IV; *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).  The reason for this

"particularity" requirement is to prevent general searches.  *Maryland v. Garrison*, 480 U.S. 79,

84 (1987).  "By limiting the authorization to search to the specific areas and things for which

there is probable cause to search, the [particularity] requirement ensures that the search will be

carefully tailored to its justifications, and will not take on the character of the wide-ranging

exploratory searches the Framers intended to prohibit."  *Id.* at 84.  A warrant is sufficiently

particular if it specifies the crimes for which the search is being conducted, so long as the warrant

does not merely reference "'evidence' of a broad criminal statute or general criminal activity."

*United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992).

---

[9] Session does not challenge that the warrant was supported by probable cause.  (*See* Docket # 109 at ¶¶ 141-45).

20

In this case, I find that the search warrant adequately described those items for which there was authorization to search. The search warrant for 67 Quentin Road authorized a search for and seizure of:

> Cocaine in violation of section 220.00 of the New York State Penal Law, cellular telephone instrument bearing telephone number (585) 802-1334 subscribed to by Shirley Session and cellular telephone instrument bearing telephone number (585) 957-4571 a prepaid cellular telephone with no available subscriber information, any evidence that tends to demonstrate that a drug related offense was committed or that a particular person participated in the commission of such offense, to include written records, books and computer records tending to show sale and trafficking of cocaine and money showing profits from the sale of cocaine, safe deposit box records and keys, records, ledgers, notes or other writing reflecting deposit, withdrawal, investment, custody or location of money, real property, personal property or other financial transactions, records, ledgers, notes or other writing reflecting ownership of said property, records reflecting the names, addresses and telephone numbers of persons from whom cocaine is purchased and sold, including but not limited to, address and telephone books, including those contained in cellular telephones or Personal Data Assistants and telephone bills; all records ledgers, notes or other writings reflecting income earned and reported to the Internal Revenue Service or other taxing agencies; indicia of occupancy, residency and/or ownership of the described premises, including but not limited to, utility and telephone bills, cancelled envelopes, keys, deeds and mortgages; photographs and video tapes that depict individuals involved in cocaine violations and/or photographs to assist in helping identify drug traffickers and their associates including undeveloped rolls of film and disposable cameras; also any firearms in violation of Sections 265.00 of the New York State Penal Law and any evidence that tends to demonstrate criminal possession of weapon[s,] including ammunition, ammunition magazines, firearm boxes, and holsters found therein; pursuant to Section 690.10(2)(3)(4) of the New York State Criminal Procedure Law.

(Docket # 124-2 at ¶ 3).

A simple reading of the search warrant makes clear that it identified two categories of evidence to be seized from 67 Quentin Road:  evidence relating to the trafficking of cocaine and evidence relating to the possession of illegal firearms.  Indeed, the warrant specifically identified the particular New York State narcotics and weapons offenses as to which it authorized the search and seizure of evidence.  Although the list of items enumerated was relatively extensive, all items appear reasonably related to the offenses upon which the search warrant was based.  Accordingly, I find that the warrant was sufficiently particular to identify for the searching officers the evidence of specific criminal activity for which they were authorized to search, *see*, *e.g.*, *United States v. Washington*, 48 F.3d 73, 78 (2d Cir.) (upholding warrant describing "specific categories of drug-related evidence sought"), *cert. denied*, 515 U.S. 1151 (1995); *United States v. George*, 975 F.2d at 76 (collecting cases upholding warrants authorizing searches for evidence of "specific illegal activity"), and I therefore recommend that Session's motion to suppress evidence from his residence on that basis be denied.

      **C.  <u>Statements Made During Interview</u>:**  Session's final motion to suppress seeks preclusion of all statements made by him to Investigator Janus during the interview at the Monroe County Public Safety Building following his arrest.  (Docket # 109).

      Statements made during custodial interrogation are generally inadmissible unless a suspect first has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the

defendant was first warned of his Fifth Amendment privilege against self-incrimination and then

voluntarily waived that right.  *Miranda v. Arizona*, 384 U.S. at 444.

> Custodial interrogation exists when a law enforcement official
> questions an individual and that questioning was (1) conducted in
> custodial settings that have inherently coercive pressures that tend
> to undermine the individual's will to resist and to compel him to
> speak (the in custody requirement) and (2) when the inquiry is
> conducted by officers who are aware of the potentially
> incriminating nature of the disclosures sought (the investigative
> intent requirement).

*United States v. Rodriguez*, 356 F.3d 254, 258 (2d Cir. 2004) (citing *United States v. Morales*,

834 F.2d 35, 38 (2d Cir. 1987) (internal citations omitted)).

In the case at bar, the government does not contest that Session was in custody or

that he was subject to interrogation at the time the statements at issue were made.  The question

is whether Session was advised of and waived his constitutional rights before speaking with

Investigator Janus.  To establish a valid waiver, the government must prove by a preponderance

of the evidence "(1) that the relinquishment of the defendant's rights was voluntary, and (2) that

the defendant had a full awareness of the right being waived and of the consequences of waiving

that right."  *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (citing *Moran v. Burbine*,

475 U.S. 412, 421 (1986)).

After careful review of the credible testimony presented to this Court, I find that

the following occurred during Janus's post-arrest interview of Session.  After entering the

interview room, Janus introduced himself to Session and inquired about his level of education.

Session responded by indicating that he had completed the eleventh grade, had received his high

school equivalency diploma and could read, write and understand English.  (Tr. 30-31).  Janus

then advised Session of his *Miranda* rights by reading the rights from a Rochester Police Department notification and waiver card.  (Tr. 30-31; G.Ex. 1).  After doing so, Janus asked Session whether he understood his rights and whether he agreed to waive his rights and speak. Session responded affirmatively to both questions, which was noted by Janus on the waiver card. (Tr. 32).

    During the substantive portion of the interview, Janus questioned Session for approximately one hour relating to Session's alleged narcotics trafficking activities.  Session appeared coherent and unaffected by any drugs or alcohol and was able to respond to questions posed of him in a timely and appropriate manor.  At no time during the interview did Session indicate that he did not want to speak, nor did he ever request the assistance of an attorney.  (Tr. 33, 36-37).  When Session inquired about the possibility of a cooperation agreement, Janus responded that a cooperation agreement was a possibility, but that he was not authorized to make any assurances or agreements.  (Tr. 35, 64; G.Ex. 2).  Session himself testified that he was aware during the interview that Janus did not have the authority to determine what, if any, criminal charges would be brought against him or what sentence might ultimately be imposed.  (Tr. 89).

    On this record, I determine that Investigator Janus properly advised Session of his *Miranda* rights.  Although Janus did not check the box on the *Miranda* card appearing next to the statement, "If you wish to talk with me, you can stop me at any time" (G.Ex. 1), I find that he did inform Session of this right, along with the others constituting the panoply of *Miranda* rights. Having heard Janus's testimony and evaluated his credibility, I credit his sworn testimony that he did advise Session of all his rights, including the right to stop the interrogation at any time.  (Tr. 30, 32, 51).

I further find that Session's waiver of his constitutional rights was knowing and voluntary.  I reject Session's contention that any purported waiver was involuntary because it was induced by "convincing him that the benefits of cooperation with the [g]overnment would be lost without immediate cooperation."  (Docket # 123 at 10).  I accept Janus's testimony, rather than Session's conflicting testimony, that it was Session himself who broached the idea of cooperation with the interviewing agents and that Janus never threatened that Session's opportunity to cooperate was "now or never" (or words to that effect).  (Tr. 34, 61-64).  I find that the discussion about cooperation that occurred during Session's interview was not coercive and did not taint the voluntariness of Session's waiver.  *See*, *e.g.*, *United States v. Alvarado*, 882 F.2d 645, 650 (2d Cir. 1989), *cert. denied*, 493 U.S. 1071 (1990); *cf. United States v. Anderson*, 929 F.2d 96, 102 (2d Cir. 1991) (agent's statements during custodial interrogation that defendant must choose between having an attorney present and cooperation were coercive and rendered his waiver involuntary).  Accordingly, I recommend denial of Session's motion to suppress statements on the grounds that they were obtained in violation of his Fifth Amendment rights.

## II.  Motion to Dismiss Count Three

Session moves to dismiss the third count of the indictment charging him with violating 18 U.S.C. § 924(c) by possessing a weapon in furtherance of a drug trafficking crime.  According to Session, the two handguns he is charged with possessing were recovered from the apartment of Kennetta Powell at 1305 Culver Road, Rochester, New York.  Session contends that the government has failed to demonstrate that he actually possessed either of the two

weapons, let alone that he possessed such weapons in furtherance of any crime.  (Docket # 109 at ¶ 128).  In essence, Session argues that the indictment is based upon insufficient evidence.

It is well-established that an indictment that is valid on its face, as is the case here, cannot be dismissed on the grounds that is based on inadequate or insufficient evidence.  *United States v. Williams*, 504 U.S. 36, 54 (1992); *United States v. Calandra*, 414 U.S. 338, 345 (1974); *United States v. Casamento*, 887 F.2d 1141, 1182 (2d Cir.1989), *cert. denied*, 493 U.S. 1081 (1990).  Instead, the appropriate time to make such a motion is after the government has presented its case at trial.  *See*, *e.g.*, *United States v. Gambino*, 809 F. Supp. 1061, 1079 (S.D.N.Y. 1992); Fed. R. Crim. P. 29(a).

Applying the above-cited authority, it is my recommendation that Session's motion to dismiss the indictment on the grounds of insufficiency of the evidence be denied without prejudice at this time.  Session's motion should more appropriately be raised at trial following the conclusion of the government's proof.


### III.   Motion to Enforce Cooperation Agreement

Session's final motion is to enforce a cooperation agreement he contends he entered into with the government.  (Docket # 109).  Session argues that he provided valuable and substantial assistance to the United States Attorney's Office to satisfy his obligations under a cooperation agreement he negotiated with the government.  As a result, Session further maintains, the government should be compelled to satisfy its concomitant obligation to move for a downward departure under Section 5K1.1 of the United States Sentencing Guidelines (the "Guidelines") at his sentencing.  (Docket # 109).

Despite Session's repeated references to a cooperation agreement, it is undisputed that no formal cooperation agreement was executed by the parties.  Rather, a letter agreement entitled a "Proffer Agreement" was executed by Session, his counsel and counsel for the government on April 18, 2005.  The first sentence of the agreement describes its purpose as follows:  "to memorialize the representations made by the United States Attorney's Office for the Western District of New York . . . as to the use that can be made of information [the defendant] provide[s] during the course of interviews with government personnel for the purposes of allowing the government to assess [the defendant's] value as a potential witness."  (Docket # 124-1 ("Gregory Aff."), Ex. A at 1).  The agreement further provides that it embodies the entirety of the parties' agreement and that "no other promises or agreements exist between the government and Daryl Session."  (*Id.* at 1).

Pursuant to the terms of the agreement, Session promised to provide "complete and truthful" information about all criminal activities known by him.  (*Id.* at ¶ 1).  In return, the government agreed that it would "evaluate and give full consideration to the nature, extent, and value of any cooperation provided by the witness."  (*Id.* at ¶ 2).  Session acknowledged that the government retained the "sole discretion" to evaluate his cooperation and to decide "what benefit, if any, should be afforded to the witness in return for that cooperation, including any potential sentence reduction."  (*Id.*).  Significantly, the agreement stated that Session understood that he would receive no benefit "purely for participation in this proffer" and that "the government has made no promises or commitments of any kind to [him] regarding the prosecution of any offenses or the sentence in this or any other case."  (*Id.* at ¶ 3).

Pursuant to this agreement, several proffer sessions were conducted between the government and Session.  The government acknowledges that during those meetings it discussed with Session the possibility that he might receive a reduced sentence were he to plead guilty and cooperate fully.  According to the government, however, it never made any promises to Session relating to the specific offenses to which he would be required to plead guilty, any specific sentence he would ultimately receive or even whether the government would file a motion for a downward departure.  (Gregory Aff. at ¶ 3).  Session does not dispute those representations beyond arguing that the proffer agreement itself obligated the government to make a motion for a sentence reduction.

After the proffer sessions, on June 10, 2005, the government provided a proposed plea agreement and proposed felony information to Session's counsel.  By contrast to the proffer agreement, the proposed plea agreement explicitly provided that if Session were to comply fully with the terms of the agreement, including providing substantial cooperation, the government would move for a downward departure pursuant to Section 5K1.1 of the Guidelines.  (Gregory Aff. at ¶ 4, Ex. B at ¶¶ 22-32).

Session did not respond to the proposed plea offer even though it remained open for several months.  At some point during that time period, the government learned (not from Session) about his alleged involvement in a homicide that occurred during the time frame of the charged federal narcotics conspiracy.  As a result of this information, the government informed Session's counsel on April 10, 2006 that it was withdrawing its proposed plea offer.  Further plea negotiations involving enhanced Guidelines calculations then occurred, but apparently did not generate a modified proposed plea agreement.  (Gregory Aff. at ¶¶ 6-9).

Session now requests the Court to compel specific performance of the proffer agreement, arguing that the government is required by the terms of that agreement to make a motion for a downward departure as consideration for the information and cooperation he has already provided.  (Docket # 109).  The government opposes the motion on the grounds that no such enforceable obligation exists.  I agree with the government.

Session's argument that the government is obligated to move for a sentence reduction is premised upon Paragraph "2" of the proffer agreement, which states in part, "The government agrees that it will evaluate and give full consideration to the nature, extent, and value of any cooperation provided by the witness."  "Full consideration," according to Session, requires the government to make a motion under Section 5K1.1 of the Guidelines.  (Docket # 114).

A plain reading of the proffer agreement makes clear that the government agreed to *evaluate and consider* the cooperation provided by Session in "assess[ing] [his] value as a potential witness."  In making that assessment, the agreement further afforded the government the discretion – to be exercised in good faith – to determine whether to offer a proffering witness any benefit in return for his "complete and truthful information."  The agreement did not require the extension of a benefit, such as a motion for a sentence reduction.  To read the agreement otherwise would deprive the government of the right to evaluate the information's usefulness to the government.  It would make no sense, and indeed be inconsistent with the provisions of Section 5K1.1 of the Guidelines, to require the government to seek a sentence reduction for those individuals who cooperate to the best of their ability, but whose cooperation does not assist the government.  Such an outcome would be precisely the result of Session's argument.

29

Session's position is also contradicted by other terms of the agreement, such as the provision that states, "The witness understands that the witness will receive no benefit purely for participation in this proffer." (*Id.* at ¶ 3). In addition, the agreement states that the government has the sole discretion to decide what benefit, "if any," to afford a proffering witness "in return for that cooperation." (*Id.* at ¶ 2). In other words, a witness who provides "complete and truthful" information is not guaranteed to receive a benefit. Here, although the government subsequently tendered a proposed cooperation agreement to Session, he failed to accept it before the government withdrew it.

In the absence of a written cooperation agreement, the Court's review of the government's decision not to file a downward departure motion is limited to a determination of whether the decision was based upon impermissible motives, such as racial or religious prejudice. *Wade v. United States*, 504 U.S. 181, 185-86 (1992); *United States v. Delvi*, 2003 WL 23018790, *2 (S.D.N.Y. 2003) ("A defendant may not voluntarily enter into a proffer agreement and then, based on the information revealed to the Government in the proffer session, bootstrap the prosecutor into acting on his behalf [by filing a Section 5K1.1 motion]"). "It follows that a claim that a defendant merely provided substantial assistance will not entitle a defendant to a remedy or even to discovery or an evidentiary hearing." *Wade v. United States*, 504 U.S. at 186.

In this case, Session has not presented any evidence that the government's conduct was motivated by any unconstitutional purpose. Rather, Session makes only conclusory allegations that the government was motivated by the desire to prevent Session from standing trial on the homicide allegations. I decline to interpret the Constitution to constrain the government from conditioning a cooperation agreement on a witness' acceptance of

30

responsibility for uncharged, as well as charged, conduct – no matter the strength of the evidence against the defendant as to that conduct.  It simply cannot be said that the government acts unlawfully by declining to extend a cooperation agreement to a defendant who contests his responsibility for crimes that the government has a good faith basis to believe he has committed.

Session has not contested the government's good faith belief that he was involved in the uncharged homicide.  If he did, an evidentiary hearing might well be required.  Rather, Session has simply argued that the government acted in bad faith by conditioning any cooperation agreement on his acceptance of responsibility for that conduct.  Such generalized allegations of bad faith or improper motive neither entitle Session to an evidentiary hearing or to the ultimate relief he seeks – a sentencing motion.  *See Wade*, 504 U.S. at 186 ("generalized allegations of improper motive" are insufficient to satisfy defendant's burden to demonstrate entitlement to discovery or evidentiary hearing).

The only remaining question is whether Session may seek to enforce the unsigned cooperation agreement contained within the plea agreement originally offered by the government.  Elemental principles of contract law foreclose such a claim.  To be enforceable, a contract must have the assent of both parties.  *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) ("[m]utual assent is essential to the formation of a contract"); *see also* 22 N.Y. Jur. 2d Contracts § 29.  Session has never accepted the government's offer despite having had ample opportunity and time to do so.  Moreover, Session never entered a plea of guilty before the district court.  *United States v. Valle*, 1988 WL 123633, *2 (W.D.N.Y. 1988) ("[a] promise by a prosecutor need not be enforced until a plea of guilty is entered on such promise").  *See also*

31

*Mabry v. Johnson*, 467 U.S. 504, 507-508 (1984); *United States v. Carbone*, 739 F.2d 45, 46 (2d Cir. 1984).

   Accordingly, it is the recommendation of this Court that Session's motion to compel the government to seek a sentence reduction be denied.

<b><u>CONCLUSION</u></b>

   For the foregoing reasons, it is my recommendation that Session's motion to suppress statements and tangible evidence, to dismiss Count Three of the indictment and to compel specific performance of a cooperation agreement **(Docket # 109)** be **DENIED**.

                 *s/Marian W. Payson*
                   MARIAN W. PAYSON
                 United States Magistrate Judge

Dated: Rochester, New York
    May   24  , 2007

32

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[10]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

         *s/Marian W. Payson*
          MARIAN W. PAYSON
        United States Magistrate Judge

Dated: Rochester, New York
     May __24__, 2007

---

[10] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(F) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).